FILED'09 JUN 29 15:01 USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CENTER FOR BIOLOGICAL DIVERSITY;             Civil No. 08-302-CL
FOREST SERVICE EMPLOYEES FOR
ENVIRONMENTAL ETHICS; and                    ORDER AND
KLAMATH SISKIYOU WILDLANDS                   REPORT AND RECOMMENDATION
CENTER,

        Plaintiffs,

   v.

MARY WAGNER, Regional Forester,
Region Six, USDA-Forest Service; and
KAREN SHIMAMOTO, Forest Supervisor,
Fremont-Winema National Forest,

        Defendants,

   and

MARJORIE IVERSON; and LAWRENCE
IVERSON,

        Intervenors.

CLARKE, Magistrate Judge:

    Plaintiffs challenge decisions made by the Forest Service to allow grazing on the

Antelope Allotment in the Fremont-Winema National Forest (Allotment) in the years 2000

1 - ORDER AND REPORT AND RECOMMENDATION

through 2007. Plaintiffs allege that these grazing decisions have caused and contributed to the precipitous decline of the Oregon spotted frog population in Jack Creek, and allege violations of the National Forest Management Act (NFMA), the Clean Water Act (CWA), and Public Law 108-108 or, in the alternative, the National Environmental Policy Act (NEPA) and the Appeals Reform Act. Plaintiffs seek declaratory relief, injunctive relief, and their reasonable attorney's fees and expenses. This court has jurisdiction pursuant to 28 U.S.C. § 1331. Before the court is plaintiffs' motion for summary judgment and permanent injunction (#68), defendants' motion for summary judgment (#98), intervenors' motion for summary judgment (#81), and intervenors' motion to strike (#82). For the reasons explained, intervenors' motion to strike is denied; and plaintiffs' motion for summary judgment should be denied; defendants' motion for summary judgment should be granted; and intervenors' motion for summary judgment should be granted.

## BACKGROUND

The Forest Service manages the National Forest System under NFMA, 16 U.S.C. § § 1600 et seq., by first "developing a Land and Resource Management Plan (Forest Plan) for each unit of the National Forest System. The Service then implements the Forest Plan by approving or disapproving site-specific actions. The NFMA and service regulations require that proposed actions be consistent with the Forest Plan. 16 U.S.C. § 1604(I)." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1092 (9th Cir. 2003). Under the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1751-1753, the Forest Service is authorized to allow livestock grazing on a "designated area of land available for livestock grazing," called an allotment, within a national forest. 36 C.F.R. Ch. II, Part 222; 36 C.F.R. § 222.1(b)(1). The

Forest Service manages livestock grazing on an allotment by issuing a grazing permit; an

allotment management plan (AMP); and an annual operating plan (AOP) or instruction (AOI).

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 979 (9th Cir. 2006) (*ONDA*).  A

grazing permit is "any document authorizing livestock to use National Forest System or other

lands under Forest Service control for the purpose of livestock production."  36 C.F.R. §

222.1(b)(5); *see* 43 U.S.C. § 1702(p).  "A permit grants a license to graze and establishes:  (1)

the number, (2) kind, (3) and class of livestock, (4) the allotment to be grazed, and (5) the

period of use."  *ONDA*, 465 F.3d at 980 (citing 36 C.F.R. §§ 222.1 - 222.4; 43 U.S.C.  § 1752).

An existing permittee has first priority for renewal if certain conditions are met.  36 C.F.R.  §

222.3; 43 U.S.C. § 1752(c).   A grazing permit is ordinarily issued for a term of ten years, and

may be canceled, modified, or suspended under certain conditions.  36 C.F.R. § 222.4; 43

U.S.C. § 1752.  An AMP is

> an allotment-specific planning document that:  (1) prescribes the manner in, and
> extent to which, grazing operations will be conducted in order to meet multiple-
> use and other goals and objectives; (2) describes any range improvements in
> place or to be installed and maintained to meet allotment objectives; and (3)
> contains any other grazing management provisions and objectives prescribed by
> the Forest Service.

*Or. Natural Desert Ass'n v. U.S. Forest Serv.*, 312 F. Supp.2d 1337, 1340 (D. Or. 2004) (citing

36 C.F.R. § 222.1(b)(2)).  As shown in the record, an AOP or AOI is issued annually prior to

the grazing season and sets out instructions to the permittee for that season's grazing operations.

"Because an AOI is issued annually, it is responsive to conditions that the Forest Service could

not or may not have anticipated and planned for in the AMP or grazing permit, such as drought

conditions, timing and duration of rainfall over the grazing season, success or failure of habitat

restoration projects, water quality, or degree of risk to threatened or endangered species affected

by grazing." *ONDA*, 465 F.3d at 980-81.   The AOP or AOI is an agreement signed by the

Forest Service and the permittee and, as shown in the record, provides that it is made part of the

permittee's grazing permit.

In 1993, U.S. Fish & Wildlife Service determined that listing the Oregon spotted frog as

threatened was warranted because it was "known to be severely declining," making the frog a

"candidate species," but listing was precluded by work on other species with a higher priority.

58 Fed. Reg. 27260 at 27262 (May 7, 1993).

Jack Creek is an intermittent, Class IV stream, with a three-mile section of perennial,

Class III stream, located within the Allotment in the Chemult Ranger District, Winema National

Forest.  (AR 402, 411.)  A population of the Oregon spotted frog was discovered in Jack Creek

in the spring of 1996.  (AR 738, 1960; SAR 291.)  It is one of five populations in the Klamath

Basin.  Oregon spotted frogs sampled from the Klamath Basin populations appear to compose a

genetic unit more divergent from other sampled populations.  The population of Oregon spotted

frog living in the perennial reach of the Jack Creek drainage has been described by Forest

Service personnel as "unique" because it is located at the highest elevation recorded for the frog

in the Klamath Basin; its isolated population; it lacks exotic aquatic predators; and it is within

an active grazing allotment.  (AR 2337, 2352, 2861; SAR 291.)  The Jack Creek Oregon spotted

frog population has declined over the last approximately eight years.  Egg mass counts in 2000

show 324 (55 national forest and 269 private), to 67 egg masses (6 national forest and 61

private) in 2002 and 11 in 2007 (0 national forest and 11 private); in 2008, 21 egg masses were

counted (11 national forest and 10 private).  (AR 1959, 2337, 2353, 3824, 3825.)  Adult capture

surveys show an increase on national forest lands until 2000 (129), then a decline in 2003 (43)

and thereafter, with 12 in 2006.  (AR 2540, 2899, 3825.)

On June 5, 1996, the Forest Service issued Grazing Permit number 01002 to Lawrence

and Marjorie Iverson (1996 Permit).  The terms of the grazing permit set the number of

livestock at 115 cow/calf pairs of cattle for the period of use from July 1 to September 30 on the

Allotment.  This permit superseded the permit issued April 10, 1985.  (AR 557.)  The permit

expired December 31, 2004.  (AR 558.)

In 1995 or 1996, nine acres of middle Jack Creek were excluded from grazing  by

construction of an exclosure fence, which remained through approximately the 2000 grazing

season.  (AR 550, 606, 721, 838, 869, 871, 2357.)  Most of the Allotment east/west boundary

fence was reconstructed in 1998.  (AR 873.)  In April 2000, the Forest Service wrote to the

Iversons asking for help from them in repairing the exclosure fences.  (AR 853.)   By 2001 the

Jack Creek exclosure fence as well as others on the Allotment were in disrepair, and cattle were

able to access Jack Creek.  (AR 1174, 1964-1965, 2356-57; SAR 67-77, 119, 2533.)

2001 to 2005 and 2007 were considered drought years in the Klamath basin.  (AR 3621,

3902; SAR 2396.)

The 2002 Annual Operating Plan (AOP) authorized 419 pair (315 national forest and

104 private land[1]) for the period July 1 - September 30; and 50 pair for the period June 21-30 on

---

[1]    The 2002 AOP and the 2003-2006 AOIs did not break out the authorized numbers of
cattle on national forest versus private land.  The court's break down is based upon the 2006-2008
AOIs which provided a breakdown (AR 2664-2665, 2991-2992, 3859-3860), and the numbers

national forest and private land.[2] The Iversons were "encouraged to manage" the herd in part

by, "After 8/01, special attention should be paid to minimizing livestock use in the Jack Creek

area, . . . ."  Pls. Mot. for Prelim. Inj. Ex. 16.

The 2003 AOI authorized 419 pair (315 national forest and 104 private land) for the

period July 1 - September 30; and clean-up of 31 head for the period October 1 - October 15 on

national forest and private land.  The Iversons were "encouraged to manage" the herd in part by,

"8/01 through 9/07-special attention should be paid to minimizing livestock use in the Jack

Creek area, . . . ."  (AR 1681, 1683.)

The 2004 AOI authorized 419 pair (315 national forest and 104 private land) for the

period July 1 - September 30; and clean-up of 31 head for the period October 1 - October 15 on

national forest and private land.  (AR 1915.)

In 2004, U.S. Fish & Wildlife Service conducted a Species Assessment and determined

that listing of the Oregon spotted frog continued to be "warranted but precluded."  (AR 1952.)

The Forest Service Region 6 lists the Oregon spotted frog as a "Sensitive Species," meaning that

its viability is a concern due to significant current or predicted downward trends in populations

or habitat.  (AR 2419, 2850, 2854.)

While many threats to the Oregon spotted frog populations have been identified, one

likely threat is livestock grazing.  (AR 2076-2077, 2216-2217, 2850-2851, 2866-2867, 3540,

---

allowed by permits to the Iversons (*see* AR 2705, 2718).

[2]   It cannot be determined from the AOP whether the 50 pair were authorized to graze
national forest or private land.

3824-3826.)

In 2005, the Forest Service proposed to build another fence to exclude livestock from Jack Creek to "remove grazing impacts on frogs and their habitat on approximately 121 acres (approximately 3.2 miles of stream)." (AR 2353, 2200, 2205, 2216.) The Forest Service prepared a detailed response to the Iversons' letter raising concerns about the Jack Creek fence and other restoration projects. (AR 2352, 2357.) The fence was not built. The Forest Service authorized grazing by issuing AOIs in 2005, 2006 and 2007 that did not prohibit grazing in Jack Creek.[3] However, in 2006 and 2007, the AOIs included language that Jack Creek was of *"special concern,"* and providing in 2006, that "*cattle use and presence [in Jack Creek] should be avoided until approximately August 15th*" according to an attached map; and in 2007, that the cattle should be herded "away from Jack Creek in the early part of the grazing season and keep stock on the north part of the allotment in the later part of the season." (AR 2325, 2664-2665 (emphases in original), 2991-2992 (emphasis in original).)

On July 18, 2006, the Forest Service renewed Grazing Permit number 805231 to the Iversons (2006 Permit). (AR 2705.) The terms of the grazing permit set the number of livestock at 315 cow/calf pairs of cattle for the period of use from July 1 to September 30 on the Allotment. (AR 2705.) Permit number 805231 states that it superseded permit issued June 5,

---

[3]    The 2005 AOI was the same as the 2004 AOI (AR 2325); the 2006 AOI for the same numbers, broken down between national forest and private land, as in 2004 and 2005 adjusted the season to July 10 - October 9 (AR 2664); and the 2007 AOI authorized only the number permitted (AR 2991).

7  - ORDER AND REPORT AND RECOMMENDATION

1996. (AR 2705.) The permit states that it expires December 31, 2015.[4] (AR 2706.) On the same date, the Forest Service granted Term Private Land Grazing Permit number P-805231 to the Iversons, for 104 cow/calf pairs of cattle to graze on the Allotment for the period of use from July 1 to September 30. This permit superseded the permit issued on June 5, 1996. (AR 2718.)

Results of water quality monitoring of creeks on the Allotment in the years 2002 through 2007 showed readings in excess of the State numeric criteria standard for single sample readings of *E. coli* organisms. (AR 2005, 2011, 2013, 2014-2015, 2075-2076, 2144, 2337, 2407, 2539, 2724, 3282.)

In June 2008, after this litigation was commenced and plaintiffs had filed a motion for preliminary injunction, the Forest Service decided to build the Jack Creek riparian fence to control cattle access along the perennial section (middle) of Jack Creek. (AR 3826.) The 2006 Permit was modified in May 2008 to change the grazing season to August 1 to September 30 for the 2008 calendar year, and provided that, "No grazing authorized on the [Allotment] until the Jack Creek Riparian Fence is completed and livestock access to Oregon Spotted Frog habitat along Jack Creek is controlled." (AR 3760.)

Because of the Forest Service's decision to construct the Jack Creek fence and the May 2008 modification to the permit, in June 2008, the parties entered into a Stipulation regarding grazing on the Allotment in the 2008 season. (#47 Stipulation and Order Concerning Mot. for

---

[4]    Plaintiffs assert that, because the maximum term a permit may be issued is 10 years, 36 C.F.R. §§ 222.1(23), 222.3(c)(1), and the 2006 Permit expired December 31, 2004, the permit's expiration should be December 31, 2014, and the Forest Service has violated its regulations. Defendants do not reply to plaintiffs' assertion.

Prelim. Inj.)  The Stipulation provided in pertinent part:

> a. Defendants will provide Plaintiffs and Intervenors with notice 30 days
> prior to turnout of any livestock on the Allotment if Defendants should decide to
> authorize or allow livestock grazing on the Allotment before the fence referred to
> in paragraph 3 is completed.
> b. To address the potential for unauthorized use of the Winema Antelope
> Allotment, Intervenors agree to ride the relevant adjoining allotment boundary
> fences and herd stray cattle off the Allotment and undertake any necessary
> maintenance on relevant and adjoining boundary fences to address potential for
> unauthorized use of the Allotment.
> c. Upon this Court's entry of the stipulation and [proposed] Order
> (below), Plaintiffs agree to withdraw their motion for preliminary injunction.
> Plaintiffs reserve the right to re-file their Motion for Preliminary Injunction,
> potentially as a Motion for a Temporary Restraining Order, should Defendants
> decide to authorize or allow livestock grazing on the Allotment before the fence
> referred to in paragraph 3 is completed or should Plaintiffs believe the fence
> referred to in paragraph 3 is inadequate to protect the frog and its habitat.

(#47 Stipulation and Order at 3-4.)  Plaintiffs subsequently withdrew their motion for

preliminary injunction.  (#50 Notice.)

In the 2008 AOI, the Forest Service allowed grazing on the Allotment as of August 2,

2008.  (AR 3860.)  Although the Iversons planned to move the majority of the herd through

Nelson Gate on August 5th, they opened the gate on August 7, 2008.  (AR 3856, 3857, 3860;

Nevill Decl. ¶ 7.)  The 2008 AOI further provided in a notation to authorized land use: "There

will be no cattle grazing on the parcels of [NFS] land encompassed by the upper and lower

Jamison pasture fences, at least until completion of the [Allotment] AMP or, unless the Iversons

independently fence their private land out from intermingled NFS property."  (AR 3860.)  In the

"Grazing strategy" portion of the AOI, it was stated that,

> "*Jack Creek is of special concern*–Please manage the cattle by herding them
> away from the Jack Creek riparian fence in the early part of the grazing season
> and keep stock on the north part of the allotment in the later part of the season.
> . . . In addition to the proposed distribution schedule, the permittee  needs to ride

9  - ORDER AND REPORT AND RECOMMENDATION

> and check the newly created Jack Creek riparian fence to insure there is no
> breach of cattle to the no-graze portion of Jack Creek (i.e. behind the newly
> constructed fence).  The permittee **shall take quick action at a breach location to
> assure that cattle do not graze the closed-off area.**

(AR 3861 (italics and bold in original).)

On May 9, 2009, Grazing Permit Modification No. 2 modified the 2006 Permit to add

the Jack Creek riparian fence 3.5 miles to the maintenance responsibility of the permittee.

(Second Wahl Decl. Att. 2.)  On the same date, Grazing Permit Modification No. 3 modified the

permit to reduce the permitted livestock numbers from 315 cow/calf pairs to 275 cow/calf pairs

for the July 1 to September 30 season.  Modification No. 3 states: "Reduction is to account for

the Jack Creek Riparian pasture capacity that will not be available until the Allotment

management Plan is updated."  (Second Wahl Decl. Att. 3.)

The court was advised at oral argument by Chemult District Ranger Wahl that the

Forest Service is in the process of doing an analysis of the Allotment, in addition to other

allotments, which will culminate in an AMP, which will include issues such as grazing impacts,

resources, other threatened, endangered, sensitive resources and vegetation.  He advised that the

AMP should be completed in early 2010.  (Tr. 78-79.)

## LEGAL STANDARDS

Judicial review of agency action is governed by the Administrative Procedure Act

(APA).  5 U.S.C. § 706.  The reviewing court

> must consider whether the decision was based on a consideration of the relevant
> factors and whether there has been a clear error of judgment.  Although this
> inquiry into the facts is to be searching and careful, the ultimate standard of
> review is a narrow one.  The court is not empowered to substitute its judgment
> for that of the agency.

10  - ORDER AND REPORT AND RECOMMENDATION

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citations omitted),

*abrogated on another ground by Califano v. Sanders*, 430 U.S. 99 (1977).  While such review

is deferential to the agency action taken, *Lands Council v. Martin*, 529 F.3d 1219, 1225 (9th Cir.

2008), the court must not "'rubber-stamp'" the agency action as correct, *N. Spotted Owl (Strix*

*Occidentalis Caurina) v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).  The court may set

aside an agency's action if the action is "arbitrary, capricious, or an abuse of discretion, or

otherwise not in accordance with law . . . ." 5 U.S.C. § 706(a)(2).  "An agency action is also

arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action

including a "rational connection between the facts found and the choice made."'" *Friends of*

*Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp.2d 1121, 1131 (D. Or. 1997) (quoting

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983)).

   The parties have filed cross-motions for summary judgment.  Because the court's review

under the APA is generally limited to the administrative record, *see infra*, no facts are in

dispute.  However, summary judgment may be used as a vehicle for the court to conduct its

review of the record.  The court's role is "to determine whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did."

*Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

## I.  Intervenors' motion to strike

   Intervenors move to strike the Second Johnston Declaration filed with plaintiffs' motion

for summary judgment and permanent injunction on the ground that his declaration does not fall

within one of the limited exceptions to the general rule excluding extra-record evidence in cases where judicial review of an agency decision is based upon the administrative record, as here. Plaintiffs respond that Mr. Johnston's declaration meets one or more of the exceptions and is properly before the court.

As the parties acknowledge, while judicial review of administrative action is generally limited to the administrative record, certain exceptions apply:

> 1) to determine whether the agency considered all relevant factors; 2) to determine whether the agency's "course of inquiry was sufficient or inadequate"; 3) when necessary to explain the agency's action; 4) when the agency has relied on evidence outside the record; 5) to explain technical terms or complex subject matter; or 6) when there is a showing of agency bad faith.

*Hells Canyon Pres. Council v. Jacoby*, 9 F. Supp.2d 1216, 1221-23 (D. Or. 1998) (and cases cited). Extra-record evidence may also be considered in relation to a request for injunctive relief. *See Nat'l Parks and Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001).

In the circumstances of this case, the court finds that Mr. Johnston's declaration may be helpful to issues to be decided in this case relating to defendants' argument that plaintiff's NFMA claims are moot and to plaintiffs' request for injunctive relief. Accordingly, intervenors' motion to strike is denied.

## II. Cross Motions for Summary Judgment

### Public Law 108-108 and NEPA Claims

Plaintiffs contend in their sixth and seventh claims that defendants violated Public Law 108-108 and NEPA when they issued the 2006 grazing permit because the 2006 Permit included a changed term from the 1996 Permit--an increased number of authorized cattle of 315 cow/calf

pair instead of the 115 cow/calf pair authorized in the 1996 Permit. Plaintiffs assert that

defendants must therefore conduct an environmental analysis pursuant to NEPA requirements.

Defendants respond that, because the 1996 Permit was modified in 2001 to increase the number

of cattle from 115 to 315, the 2006 Permit is consistent with Public Law 108-108 and neither

the Public Law nor NEPA were violated. Intervenors contend that the 2006 Permit actually

reduced the number of authorized cattle on the Allotment and is consistent with the purposes of

Public Law 108-108.

Section 325 of Public Law 108-108 provides in pertinent part that a grazing permit

which expires during 2004-2008 "shall be renewed" and the terms and conditions contained in

the expired permit "shall continue in effect under the renewed permit" until the Forest Service

"completes processing of such permit . . . in compliance with all applicable laws and

regulations."

Here, there is no 2001 permit modification included in the administrative record. In

contending that the 1996 Permit was modified in 2001, defendants rely on evidence outside the

administrative record. Plaintiffs contend that the declarations offered by defendants are post

hoc rationalizations that cannot be advanced to remedy inadequacies in the record.

Ordinarily, judicial review of an agency decision is based upon a review of the

administrative record. However, in certain circumstances, the court may expand review beyond

the record or permit discovery.

> The district court may inquire outside the administrative record when necessary
> to explain the agency's action. When such a failure to explain agency action
> effectively frustrates judicial review, the court may "obtain from the agency,
> either through affidavits or testimony, such additional explanation of the reasons
> for the agency decision as may prove necessary." Camp v. Pitts, 411 U.S. 138,

> 143 [] (1973). The court's inquiry outside the record is limited to determining
> whether the agency has considered all relevant factors or has explained its course
> of conduct or grounds of decision. [Friends of the Earth v. ]Hintz, 800 F.2d
> [822,] 829 [9th Cir. 1986)].
>
> The district court may also inquire outside of the administrative record
> "when it appears the agency has relied on documents or materials not included in
> the record." . . . .

*Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436, *amended by* 867 F.2d 1244 (9th Cir. 1988)

(citations omitted); *see Asarco, Inc. v. EPA*, 616 F.2d 1153, 1158-60 (9th Cir. 1980); *Jacoby*, 9

F. Supp.2d at 1221-23.

Here, defendants offer the Second Declaration of Michael B. Nevill, a Forest Rangeland

Management Specialist. He has been the Rangeland Program Manager for the Fremont-

Winema National Forest for seven and one-half years (Nevill Decl. ¶ 1) and has been involved

in the grazing permit management of the Allotment since 2000 (Second Nevill Decl. ¶ 2). In his

second declaration, Mr. Nevill explains the circumstances of the waiver to the Government in

2000 by Robert Hass of his authorized 250 cow/calf pairs. Mr. Nevill states:

> The Chemult District Ranger responded to this waiver by authorizing the
> Iversons to graze up to 200 additional head of cattle that Mr. Hass previously had
> been authorized to graze under his waived-back permit. The District decided to
> effectuate this increased authorization through a process of modifying the
> Iversons' 1996 grazing permit to reflect the capacity on the allotment made
> available when Mr. Hass returned his permit to the Government. AR 0875-0876.
> The permit modification changed the number of livestock authorized to graze
> under the Iversons' permit from 115 cow/calf pairs to 315 cow/calf pairs per
> season.

(Second Nevill Decl. ¶ 4.) Mr. Nevill goes on to declare that,

> Notwithstanding diligent efforts on the part of Forest Service personnel to find
> paperwork documenting this modification, such efforts have been unavailing and
> so it is not known whether such paperwork exists; nevertheless, AOIs and Bills
> for Collection prepared for the Iversons with respect to all subsequent seasons
> reflect the increased authorization resulting from the permit modification.

14  - ORDER AND REPORT AND RECOMMENDATION

(Second Nevill Decl. ¶ 4.)  Mr. Nevill states that, when the Iversons' permit expired, it was

reissued in 2006 with the same terms and conditions "as it had been modified as explained

above in 2001."  (Second Nevill Decl. ¶ 5.)  With their reply brief, defendants offer the Third

Declaration of Mr. Nevill, to which he attaches an unsigned permit modification, and a May

2001 letter from the Silver Lake and Chemult district rangers to the Iversons indicating that the

term permit modification was attached for their review and signature.  (Third Nevill Decl. Atts.

2 & 3.)  Mr. Nevill declares that the 2001 permit modification was prepared and a copy, without

signatures, was located in a permit administration file from the time period.  He declares that,

"The Forest Service range personnel assigned to administer this permit transferred to the Sierra

National Forest in June of 2001, leaving the Permit Modification file incomplete."  (Third

Nevill Decl. ¶ 5.)  He further declares:

> The two documents noted above were found while I was reviewing a permit
> administration folder from the Silver Lake Ranger District.  Prior to 2001, the
> Fremont and Winema National Forests were separate units and kept separate
> files.  The range records in the Administrative Record were found primarily in
> files from the Chemult Ranger District and files from the combined Forests.  In
> May 2001, a formal filing process integrating the files for the combined Forests
> had not yet been developed and these two documents did not get into the proper
> file.

(Third Nevill Decl. ¶ 6.)

The unsigned permit modification attached to the Third Nevill Declaration references

the Iverson's June 5, 1996, permit and provides in pertinent part that the permit is modified as

follows: "Term Grazing Permit Numbers are increased from 115 cow/calf pairs to a total of 315

cow/calf pairs," and "additional maintenance responsibility" as to certain fencing was added as

detailed.  The document provides: "This permit is being modified for the following reason:

Reflects available capacity waived back to the government in 2000 with no preference for a new permittee. This capacity is added to this permit for management reasons." (Third Nevill Decl. Att. 2.) The May 9, 2001, letter from the Silver Lake and Chemult district rangers to the Iversons attached to the Third Nevill Declaration states in pertinent part: "Attached to this letter is the 2001 Annual Operating Plan for the Antelope Fremont and Winema allotments. Term Permit modifications for your Fremont and Winema National Forest permits and a Temporary Grazing Permit are included for your review." (Third Nevill Decl. Att. 3.)

The court finds that the extra-record evidence offered by defendants explains the gap in the administrative record and is admissible. A review of the administrative record indicates that the extra-record evidence is supported by contemporaneous documents in the record, and is consistent with the administrative record, subsequent actions of the Forest Service and the Iversons, and with comments by Forest Service personnel.

The administrative record shows that, in 1996, 1997, and 1998, the Iversons grazed 115 cow/calf. (AR 574, 622, 650.) In 1999, Robert Hass was authorized by permit to graze 250 cow/calf pair from July 1-September 30. (AR 765.) The record shows that, since 1999, the Iversons intended to graze additional cattle and that the Forest Service intended to allow the additional number pursuant to Hass's nonuse of his permit. In 1999, pursuant to nonuse by Hass (AR 719, 723; see AR 716), and in 2000, pursuant to Hass's permit waiver (AR 836, 853, 868, 874), the AOIs show that the Iversons grazed an increased number of cattle.

The administrative record indicates that the Forest Service intended in 2001 to sign a permit modification for increased cattle and to assign maintenance: in a February 2001 letter to the Iversons, district rangers Wisdom and Goularte state that, "We have scheduled to meet and

16 - ORDER AND REPORT AND RECOMMENDATION

review the 2000 grazing season and formulate 2001 Annual Operating Plans for your

allotment," to discuss in part, "Issue and sign permit modification for Fremont and Winema

Antelope permits to convert temporary numbers into term permit numbers" and "Assign

maintenance to fill in behind Haas waived permit." (AR 875-76.)

     The unsigned permit modification attached to the Third Nevill Declaration is consistent

with the Forest Service's stated intention in February 2001, that modifications would be made

both to increase the number of cattle and to assign maintenance, and the May 9, 2001, letter

attached to the Third Nevill Declaration indicate that permit modifications had, in fact, been

prepared and sent to the Iversons for signature. The February 2001 and May 2001 letters and

the permit modifications are all consistent. It is noteworthy that a temporary grazing permit

signed on May 9, 2001, apparently the one referenced in the May 9, 2001, letter, is included in

the record. (AR 886.) This supports an inference that the other documents referenced in the

May 9, 2001, letter, including the permit modification, were also attached to the letter. And,

like the 2001 permit modification, the Hass permit waiver in 2000 and the 2001 AOP are not

included in the record, which also supports an inference that documents relating to the Iverson's

permit, including the 2001 permit modification, were lost or misplaced in Forest Service files.

     Other evidence in the administrative record support defendants' position that the permit

modification was executed in 2001, but was lost or misplaced. The AOIs issued in subsequent

years through 2005 all included grazing of 315 pair, consistent with a modification of the permit

which increased the authorized cattle on the Allotment.[5] (Pls. Mem. in Supp. of Mot. for

---

    [5] The Iversons also held a term private land grazing permit for 104 cow/calf during these
years. (See AR 2718; see also AR 2664-2665, 2991-2992.)

Prelim. Inj. Ex. 16; AR 1681-1682, 1916-1916, 2325-2326.)  And in a July 2006 email

exchange, which apparently took place at the time that permits were being prepared, the

Chemult Ranger District inquired as to documentation of the change in the Iverson permit from

115 to 315 pair, stating, "I know that number was increased because of Iversons picking up

some Pitcher Ranch numbers but don't have any records of that change.  (AR 2704.)  The

Paisley Ranger District responded in pertinent part:

> As you know, I have never been able to find the original permit file in Chemult.
> When I arrived in Paisley there was a folder that had 2230 material in it, but it
> was somewhat incomplete.  The files here have an unsigned permit modification
> that increases Iverson's #s on the Term Grazing Permit from 115 to 315.
> It was done when Carol Goularte was the Ranger in Chemult.
> . . . .
> [INFRA] indicates the Term Grazing Permit was modified and term Private
> Permit issued May 2001
> There is also an e-mail sent by Aimee Smith in June of 2001 requesting a signed
> copy of the modification.
> looks like she never received one for the files here.
> I would assume there is a signed copy over in Chemult.
> . . . .

(AR 2703; see AR 2705.)  This 2006 email correspondence is consistent with defendants'

assertions made at this time on summary judgment.  Further, comments made by Forest Service

personnel are consistent with defendants' position that a permit modification was made to

increase the number of cattle by 200 head.  (AR 3191; see AR 868.)

All of this evidence is consistent with defendants' assertion that they did, in fact, modify

the Iversons' permit in May 2001.  If defendants did allow increased numbers of cattle on the

Allotment at certain times without a temporary permit as plaintiffs argue, this does not detract

from a finding that the Iversons' permit was modified in 2001 to increase the allowed number of

cattle.  To the extent that plaintiffs assert that there can be no permit modification without a

signature, the handbook, upon which plaintiffs rely, does not have the force and effect of law. *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). Further, there is no evidence that the permit modification was not, in fact, signed by the Iversons, only evidence that the prepared permit modification was lost or misplaced. The court is troubled that the intervenors do not contend in their motion that the 1996 Permit was modified. However, at the argument of this matter, counsel represented that it was difficult for Mrs. Iverson, who is elderly and undergoing medical treatment, to access old records, but that Mrs. Iverson recalled that the permit modification occurred in 2001 and that they would not have grazed additional cattle without official authorization from the Forest Service.

Considering the extra-record evidence along with the administrative record, which supports and is consistent with that evidence, the court finds that the Iverson's 1996 Permit was modified in May 2001 to increase the number of cow/calf pairs from 115 to 315. Accordingly, defendants did not violate Public Law 108-108 or NEPA when they issued the Iverson's 2006 term permit. Defendants' motion and intervenors' motion on this ground should be granted and plaintiff's motion should be denied.

### NFMA Claims

In the present case, plaintiffs present three claims under NFMA[6], alleging the 2002-2007

---

[6]    Plaintiffs have conceded their NFMA claim that the Forest Service violated the Forest Plan standards requiring that no more than five percent of stream banks exhibit degradation caused/perpetuated by cattle. (Tr. 44:21.)

19   - ORDER AND REPORT AND RECOMMENDATION

AOIs and the 2006 grazing permit violate: 1) Forest Plan regulations protecting the Oregon

Spotted frog; 2) INFISH and Forest Plan standards requiring modification of grazing practices

which retard riparian management objectives; and 3) implementation and effectiveness-

monitoring provisions of INFISH.  The Forest Service first contends the 2008 construction of

the Jack Creek fence and modifications to the 2006 grazing permit reducing grazing season and

numbers effectively moot plaintiffs' NFMA claims.   Plaintiffs urge their NFMA claims are not

moot because: 1) effective injunctive and declaratory relief are still available; 2) the 2002-2007

AOIs are not superseded by the 2008 AOI; and 3) mootness is excepted because the challenged

actions are capable of repetition yet evade review.  Because of changed circumstances due to the

construction of the Jack Creek fence and modifications to the grazing permit, this court

concludes that no meaningful and effective relief can be ordered and plaintiffs' NFMA claims

have been mooted.

<u>Mootness</u>

Where developments subsequent to the commencement of a suit eliminate any

possibility of effective relief, Article III's requirement that there be a live case or controversy is

called into question. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S.

167, 180 (2000); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).  "To qualify as a case

fit for federal-court adjudication, an actual controversy must be extant at all stages of review,

not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520

U.S. 43, 67 (1997) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (internal quotation

marks omitted).  "[I]f an event occurs that prevents the court from granting effective relief, the

claim is moot and must be dismissed." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d

20  - ORDER AND REPORT AND RECOMMENDATION

1118, 1123 (9th Cir. 1997). "The burden of demonstrating mootness is a heavy one." *Nw.*
*Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988).

Because "courts of equity have broad discretion in shaping remedies," the mootness
inquiry is not whether the remedy initially sought by the plaintiff is still available, but "whether
there can be *any* effective relief." *Id.* at 1244-45 (emphasis added). Federal courts may order
relief in the form of mitigating the continuing harm of prior, ceased conduct. "[W]here the
violation complained of may have caused continuing harm and where the court can still act to
remedy such harm by limiting its future adverse effects, the parties clearly retain a legally
cognizable interest in the outcome." *Id.* at 1245. In *Gordon*, for example, prior harm to fish
populations was mitigated by allowing more fish to spawn in future years. *Id.* Similarly, in
*Forest Guardians v. United States Forest Service*, prior harm to land was mitigated by an
injunction removing livestock. 329 *F.3d 1089,* 1094 (9th Cir. 2003). An exception to the
mootness doctrine applies in extraordinary cases where the issue is capable of repetition yet
evades review. This limited exception applies only to extraordinary circumstances where:
"(1) the duration of the challenged action is too short to be fully litigated before it ceases, and
(2) there is a reasonable expectation that the plaintiffs will be subject to the same action again."
*Am. Rivers*, 126 F.3d at 1123 (quoting *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933,
939 (9th Cir. 1987)).

Standing and mootness are both threshold Article III jurisdictional issues. *Arizona*, 520
U.S. at 66. Because mootness precludes a court from proceeding to the merits of a case,
*Missouri v. Craig*, 163 F.3d 482 (8th Cir. 1998), a court may assume standing in order to
resolve the issue of mootness. *Arizona*, 520 U.S. at 66-67 (assuming standing to decide

21  - ORDER AND REPORT AND RECOMMENDATION

mootness); *Burke v. Barnes*, 479 U.S. 361, 363, 364 (1987) (leaving issue of standing

unresolved because case was determined moot).

In the present case, the record demonstrates Allotment grazing was significantly altered

in 2008 with the aim of keeping cattle from entering the Oregon spotted frog habitat along Jack

Creek. This was achieved primarily through the completion of a fence along Jack Creek which

excluded cattle from the Creek and riparian area. (*See* Defs. Mem. in Support of Cross-Mot. for

Summ. J. and Resp. to Pls. Mot. Ex. 4; AR 3767.) The Forest Service modified the 2006

grazing permit to ensure completion of the  Jack Creek fence before release of cattle. (AR

3760.) The 2008 AOI required monitoring of the Jack Creek fence by the Iversons and removal

of any cattle in the no-graze areas. (AR 3860-3861; *see* #47 Stipulation at 3.) In addition, the

2008 AOI restricted grazing on private lands in the adjacent Jamison pastures, where cattle

could have conceivably accessed Jack Creek riparian no-graze areas through privately

maintained fences.[7] (AR 3760.)

It appears from the record that the Jack Creek fence was effective in the 2008 season in

excluding cattle from the no-graze area of Jack Creek. Plaintiffs did not seek any restraining

orders during the 2008 grazing season on the ground that livestock grazing was allowed before

the Jack Creek fence was completed or on the ground that the fence was inadequate to protect

the frog and its habitat. (*See* #47 Stipulation at 4.)

---

[7]    The 2008 AOI provided in the authorized use section: "There will be no cattle grazing
on the parcels of [NFS] land encompassed by the upper and lower Jamison pasture fences, at least
until completion of the [Allotment] AMP or, unless the Iversons independently fence their private
land out from intermingled NFS property." (AR 3860.)

Additionally, since completion of the parties' briefing on the instant motions, in May

2009, the Forest Service modified the 2006 Permit to assign maintenance responsibility for the

3.5 mile Jack Creek fence to the Iversons. (Second Wahl Decl. Att. 2.) The permit was also

modified to reduce the permitted livestock numbers from 315 cow/calf pairs to 275 cow/calf

pairs for the grazing season "to account for the Jack Creek Riparian pasture capacity that will

not be available until the Allotment management Plan is updated." (Second Wahl Decl. Att. 3.)

In light of the changed circumstances confronting the court, the court finds there is no

present case as to which any meaningful and effective relief may be ordered. The construction

of the Jack Creek fence to protect the creek and frog habitat, the issuance of the 2008 AOI

which took into account the fence constructed, and the permit modifications which assigned

maintenance of the fence and reduced the number of cattle authorized on the Allotment, made

the 2002 - 2007 AOIs as to which plaintiffs complain and which are based on different

circumstances, obsolete and of no force or effect. The circumstances of the challenged AOIs are

non-recurring on this record. In a similar case, the Eight Circuit, in *Missouri v. Craig*,  163

F.3d 482, 485 (8th Cir. 1998), determined that, where the navigation seasons covered by the

1995-96 and 1996-97 AOPs were over, and defendant there had adopted a 1997-98 AOP which

no longer included the challenged element, the case was moot and the exception was not met.

The court found that, "In other words, whatever wrong, if any, there may have been, changed

circumstances have deprived [the court] of the ability to provide the requested remedy."

Plaintiffs assert that, despite the changes, relief is still appropriate because a declaration

would provide guidance, and an injunction would mitigate harms.  It seems clear that an

injunction to exclude cattle from the Allotment would not provide plaintiffs with any

23   - ORDER AND REPORT AND RECOMMENDATION

meaningful relief. As cattle have already been excluded from the riparian reaches of Jack Creek, an injunction would not further mitigate any continuing harm resulting from the challenged AOIs. Revegetation, healing of stream banks, and recovery of OSF populations and habitat in the Jack Creek riparian area will occur regardless of whether grazing occurs on other parts of the Allotment. In urging declaratory relief, plaintiffs contend the Forest Service's duties must be settled since "the Forest Service could revert to AOIs identical to the challenged AOIs." (Pls. Resp. to Cross-Mots. and Reply at 40.) Without a challenge to the ongoing conduct of the Forest Service , and mere speculation as to future conflict, the court finds such a declaration would be advisory in nature and, therefore, barred by the limitations of Article III. *See Gordon*, 849 F.2d at 1245 (describing moot cases as those that have lost their character as present, live controversies).

Furthermore, the Forest Service is currently undertaking a comprehensive allotment management plan in which soil issues, resources, endangered and threatened species, vegetation, and the impacts of grazing will be considered. (Tr. 78-79:15-21.) Therefore, any order by this Court requesting a review of the Allotment's management, resources, or sensitivities would have no meaningful effect, as such a study is already underway. *Cf. Miccosukee Tribe of Indians v. United States*, 420 F. Supp. 2d 1324, 1344 (S.D. Fla. 2006) (finding motion for declaratory judgment alleging mismanagement of Everglades moot since defendant Corps of Engineers indicated they were in the process of implementing relevant operational criteria in a time frame to be determined).

On the record before the court, the court finds that plaintiffs' NFMA claims are moot. Plaintiffs' claims do not fall within the capable of repetition yet evading review

24  - ORDER AND REPORT AND RECOMMENDATION

exception to the mootness doctrine. Although the challenged AOIs, which are issued annually, and possibly the 2006 Permit may evade review, since they are subject to modification and are in effect for only four months of the year, the court finds it unlikely that the alleged harms complained of will be repeated in light of the changed circumstances shown in the record. *See Missouri*, 163 F.3d at 485 (taking particular note of a changed AOP in concluding alleged harm was unlikely to recur). The Forest Service has delegated annual maintenance of the Jack Creek fence to the permittees (Second Wahl Decl. Att. 2), mandated inspection two weeks before release of cattle (Second Wahl Decl. Att. 1; AR 3862), and reduced the number of cattle authorized to graze on the Allotment (Second Wahl Decl. Att. 3). The Forest Service has expressed an interest in protecting Jack Creek and the Oregon spotted frog population from harms from livestock long before the commencement of this lawsuit. (AR 1683, 2664, 2991, 3859.)

Since the court finds that no effective relief can be ordered to address the alleged harms complained of, plaintiffs' NFMA claims are moot. *See Am. Rivers*, 126 F.3d at 1123. Defendants' motion for summary judgment on this ground should be granted and plaintiffs' motion for summary judgment as to their NFMA claims should be denied.

### Clean Water Act Claim

Plaintiffs' fifth claim for relief alleges that Forest Service permitted grazing within the Allotment has resulted in exceedences of Oregon's water quality standards thereby violating 33 U.S.C. § 1323(a) of the CWA. The Forest Service contends that: 1) Congress has not waived sovereign immunity under the CWA for suits such as this; 2) the Forest Service is in compliance

25    - ORDER AND REPORT AND RECOMMENDATION

with Oregon water quality standards and, therefore, the CWA, by implementing best

management practices; and 3) the facts do not establish a causal relationship between any water

violations and the permittees' cattle, particularly since erection of the Jack Creek fence.[8] The

court finds that, even if sovereign immunity has been waived in the circumstances here, having

implemented best management practices and been recognized as a designated management

agency by the Oregon Department of Environmental Quality, the Forest Service has not violated

§ 1323(a) of the CWA.

<u>Sovereign Immunity</u>

"[A] suit against the United States must start from the . . . assumption that no relief is

available." *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 644 (9th Cir. 1998).

Consequently, an action against a federal agency is viable only if the United States consents to

suit by unequivocal waiver of sovereign immunity. *United States v. Park Place Assocs., Ltd.*,

563 F.3d 907, 924 (9th Cir. 2009). Waivers of sovereign immunity must be construed strictly in

favor of the sovereign, and not implied through statutory history or otherwise. *Lane v. Pena*,

518 U.S. 187, 192 (1996); *U.S. Dept. of Energy v. Ohio*, 503 U.S. 607, 615 (1992). Although

closely linked in cases against the United States, sovereign immunity and subject matter

jurisdiction are distinct inquiries. *Park Place*, 563 F.3d at 923. Indeed, subject matter

jurisdiction is not an automatic waiver of sovereign immunity, nor is a waiver of sovereign

immunity a necessary conferral of subject matter jurisdiction. *Id.* at 924.

---

[8]    Defendants clarified at oral argument of this matter that their mootness argument did not
apply to the CWA claim. (Tr. 13.)

26   – ORDER AND REPORT AND RECOMMENDATION

33 U.S.C. § 1323(a), entitled *Federal Facilities Pollution Control*, provides in pertinent part that:

> "[e]ach department, agency, or instrumentality . . . of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity. . . ."

The CWA's § 1323(a) waiver of sovereign immunity is limited by 33 U.S.C. § 1371, which precludes any construction "limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter." 33 U.S.C. § 1371(a)(1).

Pointing to the limitations of these provisions, defendants argue that § 1323(a) does not waive sovereign immunity in the present case where 1) the federal government is merely permitting the activity of a third party, a function within its unique governmental capacity, and 2) the Forest Service's authority in permitting grazing, a use recognized by statute and regulation, would be infringed upon.

In supporting their argument that 33 U.S.C. § 1323 does not waive sovereign immunity for a federally permitted, third party's conduct on Forest Service lands, defendants cite *Colorado Wild, Inc. v. United States Forest Service*, a case in which the Forest Service approved a ski resort's master plan for operations on federal land without ensuring compliance with state water quality standards. 122 F. Supp. 2d 1190, 1191, 1194-95 (D. Colo. 2000). Without discussing the location of the ski resort, the district court concluded that there was neither a federal facility

27  - ORDER AND REPORT AND RECOMMENDATION

nor a federal activity resulting in the discharge of pollutants which invoked § 1323. The court

held that, "waiving sovereign immunity . . . where the only action involves the approval of a

Master Development Plan would improperly enlarge sovereign immunity beyond what

33 U.S.C. § 1323 requires." *Id.* at 1195. A similar conclusion was reached in *Olmstead Falls v.*

*United States Environmental Protection Agency*, a case concerning the federal government's

issuance of a "dredge or fill" permit for the construction of an airport on municipal land. 233 F.

Supp. 2d 890 (N.D. Ohio 2002). The court determined that § 1323 on its face waived sovereign

immunity "only where an arm of the federal government is an alleged polluter. *Id.* at 897.

Citing *Colorado Wild* and the plaintiffs' failure to allege a federal facility polluter, the district

court found "no indication in [33 U.S.C. § 1323] that Congress intended to waive sovereign

immunity with respect to agency enforcement decisions over third parties." *Id.*

Citing the language of § 1323(a), plaintiffs contend that, because the Forest Service has

"jurisdiction" over the property upon which the grazing and alleged water quality violations

occur, sovereign immunity has been waived in this case. Plaintiffs point to *Idaho Sporting*

*Congress v. Thomas*, 137 F.3d 1146, 1153 (9th Cir. 1998), *overruled on other grounds by Lands*

*Council v. McNair*, 537 F.3d 981 (9th Cir. 2008), and *Oregon Natural Resources Council v.*

*United States Forest Service*, 834 F.2d 842 (9th Cir. 1987) *(ONRC)*, two cases in which the

Ninth Circuit reviewed the Forest Service's sale of timber on federal land to a third party.

Although these cases were brought for alleged violations of § 1323, neither decision directly

addresses the CWA's waiver of sovereign immunity with regard to the permitted activities of a

private third party on federal land.

Finally, plaintiffs argue 33 U.S.C. § 1371(a)(1) does not limit a waiver of sovereign immunity where an agency has discretion to comply with water quality standards in accordance with 33 U.S.C. § 1323. In supporting this argument, plaintiffs rely upon *National Wildlife Federation v. United States Army Corps of Engineers*, a case in which the court determined the CWA's directive requiring the Corps to comply with the CWA was not absolute but "must be construed *in pari materia* with the River Harbor Act's directive that dams be built in the first instance." 384 F.3d 1163, 1178 (9th Cir. 2004). The *National Wildlife Federation* court concluded that "discretionary operations of the dams, consistent with the statutory regime established by Congress, should comply with state water law standards." *Id.* Applying this reasoning to the present case, plaintiffs assert the Forest Service must comply with § 1323 to the extent they have wide discretion in managing grazing, as evidenced by changes made in the 2006 Permit and AOIs. However, *National Wildlife Federation* does not address § 1371(a)(1) directly, nor does defendants' case on the matter, *In re Missouri River System Litigation*, 418 F.3d 915 (8th Cir. 2005), which expressly references navigation under 33 U.S.C. § 1371(a)(2).

In the present case, suit is brought under both the APA and the CWA. Plaintiffs argue that, regardless of whether sovereign immunity is waived under § 1323(a), the APA waives sovereign immunity, allowing review of their CWA claim. Plaintiffs point to a line of Ninth Circuit decisions which have found that "judicial review is available under the APA." *ONRC*, 834 F.2d at 852; *accord Nat'l Wildlife Fed'n*, 384 F.3d at 1170 n.11; *Thomas*, 137 F.3d at 1153. Although defendants do not dispute application of the APA, they challenge whether it provides an independent waiver of sovereign immunity. They argue that sovereign immunity must be

waived by both § 1323 and the APA.  None of the cases cited by plaintiffs directly address this issue.  *But see* Robin Kundis Craig, *Idaho Sporting Congress v. Thomas and Sovereign Immunity: Federal Facility Nonpoint Sources, the APA, and the Meaning of "In the Same Manner and to the Same Extent as any Nongovernmental Entity"*, 30 Envtl. L. 527, 543 (2000) (asserting that in *Thomas*, the Ninth Circuit used the APA to expand the CWA's § 1323(a) waiver of sovereign immunity).

Plaintiffs' and defendants' arguments raise a number of issues regarding the scope of both the CWA's and APA's waivers of sovereign immunity, and the extent to which the APA may be relied upon independent of § 1323(a)'s disputed limitations.  However, because the court concludes that plaintiffs' § 1323(a) CWA claim fails on the merits, it need not make any determinations upon these issues.

<u>Compliance with Oregon Law</u>

Plaintiffs primarily allege the Forest Service's grazing management has violated Oregon's water quality standards and, therefore, 33 U.S.C. § 1323, by 1) exceeding state numeric *E. coli* standards set forth in OAR 340-041-0009(1)(a); 2) not treating animal waste runoff pursuant to OAR 340-041-0009(3); and 3) causing detrimental changes to resident biological communities in violation of OAR 340-041-0011.  In response, defendants argue that, regardless of any specific violations, the Forest Service is compliant with Oregon's water quality standards to the extent it has been recognized as a designated management agency by the Oregon Department of Environmental Quality (DEQ) and has implemented relevant Best Management Practices (BMPs).  After close inspection of Congress' scheme for water pollution

control under the CWA, the Forest Service's relation with the DEQ, and Oregon's water quality standards, the court agrees with defendants that the Forest Service's implementation of BMPs constitutes compliance with Oregon law and § 1323(a) of the CWA.

Throughout the CWA, Congress clearly distinguishes between water pollution caused by point and non-point sources. Whereas *point*-sources are "discernible, confined, and discrete conveyance," such as discharge from a pipe, ditch, or machine, 33 U.S.C. § 1362; *Or. Natural Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1095 (9th Cir. 1998), *nonpoint*-sources are more diffuse, typically caused by runoff from polluting activities such as agriculture, *Dombeck*, 172 F.3d at 1098. In the present case, the parties do not dispute–and Ninth Circuit case law concurs–that "something as inherently mobile as a cow" constitutes a nonpoint source. *Id.* at 1099.

Before the enactment of the CWA in 1972, Congress controlled water pollution primarily through state water quality standards. *Natural Res. Def. Council v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990). Because enforcement of such standards was difficult, and polluters had no incentive to curb pollution in waters that met standards, Congress amended these laws to place limits upon individual point-source polluters. *Id.* "The act thus banned only discharges from point sources," *id.*, leaving regulation of nonpoint sources largely to the states through the adoption of wastewater treatment plans, *Dombeck*, 172 F.3d at 1096; *ONRC*, 834 F.2d at 849; *see* 33 U.S.C. §§ 1288, 1329.

In accordance with this scheme, the DEQ has designed specific water quality standards regulating bacterial counts in freshwater, OAR 340-041-0009(1)(a), treatment of animal waste,

OAR 340-041-0009(3), and impacts upon specie habitat, OAR 340-041-0011.  Despite these

specific measures, OAR 340-041-0061(13), entitled *Agriculture and forestry on federal lands*,

mandates that "[w]here the [DEQ] designates a federal agency as a designated management

agency, implementation of [water quality restoration plans, best management practices, and

aquatic conservation strategies] is deemed compliance with this division [relating to Water

Quality Standards for Oregon]."

     In May of 2002, the Forest Service and DEQ signed a memorandum of understanding

(MU) "recogniz[ing] the Forest Service as the Designated Management Agency (DMA) on

[National Forest Service] lands within Oregon."  (AR 1053.)  Implementation of this agreement

aimed to collaboratively promote the objectives of the CWA, *id.*, and "satisfy State and Federal

point and nonpoint source pollution control requirements," (AR 1054).

     Plaintiffs do not address these regulations but urge that because water quality monitoring

has revealed violations of Oregon's numeric *E. coli* criteria in Jack Creek, the Forest Service has

violated the CWA.  In making this assertion, plaintiffs rely upon *Oregon Natural Resources

Council v. Lyng*, which states, "[p]roper implementation of state-approved BMP's will constitute

compliance with the CWA *unless* water quality monitoring reveals that the BMP's have

permitted violation of [state] water quality standards."  882 F.2d 1417, 1424 (9th Cir. 1989)

(emphasis added).  *Lyng*, however, cites an Environmental Protection Agency handbook which

falls short of such a sweeping conclusion.  *See Nonpoint Source Controls and Water Quality

Standards*, EPA Water Quality Standards Handbook, Chapter 2 at 2 (August 19, 1987).  To the

contrary, the cited handbook recognizes BMPs as the "primary mechanism to enable the

achievement of water quality standards,"  promotes "flexibility in water quality standards," and

requires states to adjust either BMPs or standards if standards are not met:

> Proper installation, operation and maintenance of State approved BMPs are
> presumed to meet a landowner's or manager's obligation for compliance with
> applicable water quality standards.  If subsequent evaluation indicates that
> approved and properly installed BMPs are not achieving water quality standards,
> the State should take steps to: (1) revise BMPs, (2) evaluate and, if appropriate,
> revise water quality standards . . . or both.

*Id.* at 3.  Plaintiffs  also cite *Northwest Indian Cemetery Protective Association v. California*

which states "[a]dherence to . . . BMPs does not automatically ensure that the applicable state

standards are being met." 795 F.2d 688, 697 (1986), *rev'd on other grounds by* 485 U.S. 434

(1988).  *Northwest Indian Cemetery* is distinguishable, however, because it considers  a

California water quality control plan which does not consider BMPs to be water quality

standards in and of themselves. *Id.*

In contrast, the court finds *Center for Native Ecosystems v. Cables* factually analogous

and instructive.  509 F.3d 1310 (10th Cir. 2007).  Similar to the case at hand, in *Cables* the

Forest Service was sued for violations of state water-quality standards resulting from permitted

cattle grazing on federal lands.  *Id.* at 1318.  Regardless of fecal coliform levels in excess of

state standards, the Tenth Circuit Court of Appeals concluded that, under Wyoming water

quality standards, because the Forest Service had implemented BMPs pursuant to an MU with

the respective conservation district, the Forest Service could not be said to have failed to comply

with state requirements and § 1323(a) of the CWA. *Id.* at 1331-33.

In light of Congress' delegation of nonpoint-source pollution to the states, 33 U.S.C. §§

1288, 1329; *Dombeck*, 172 F.3d at 1096-97; *Lyng*, 882 F.2d at 1424; *ONRC*, 834 F.2d at 849,
this court gives deference to Oregon's water pollution control requirements. As detailed above,
the DEQ has recognized the Forest Service as a designated management agency, and Oregon's
water quality standards dictate that such agencies are compliant with state requirements where
they implement BMPs. Accordingly, the court finds that the Forest Service is not in violation of
state law or the CWA since it has complied with state requirements "in the same manner, and to
the same extent as any nongovernmental agency." 33 U.S.C. § 1323(a). As to plaintiffs' fifth
claim for violation of the CWA and the APA, the Forest Service's issuance of AOIs and the
2006 Permit in this respect was not arbitrary and capricious under the APA. Plaintiffs' motion
for summary judgment on this ground should be denied and defendants' motion should be
granted.

Plaintiffs contend in their final brief relating to their CWA claim that, as detailed in their
NFMA claim, the Forest Service has not fully implemented BMPs pursuant to Oregon's
regulations. In response to this assertion, defendants point out that this allegation was not
included in plaintiffs' complaint with respect to their CWA claim, and was not raised until after
motions for summary judgment were filed. Although the court finds merit in the argument that
plaintiffs waived this claim by failing to provide fair notice of such allegations pursuant to
Federal Rule of Civil Procedure 8, *see Swierkiewicz v. Sorema*, 534 U.S. 506, 512, (2002), the
court also concludes that the Forest Service has adequately implemented the appropriate BMPs.

Plaintiffs cite five relevant BMPs, namely 1) controlling livestock numbers and season
of use (RM-2); 2) controlling livestock distribution within allotments (RM-3); 3) rangeland

improvements (RM-4); 4) protection of wetlands (W-3); and 5) water quality monitoring. (AR 0431.) The record supports that the Forest Service has implemented BMP covering all of the five areas cited by plaintiffs. This includes adjusting grazing numbers and grazing season, constructing fences, instructions to the permittee regarding keeping cattle away from Jack Creek, and water quality monitoring. Although plaintiffs dispute the effectiveness of the BMPs, a review of the record shows the Forest Service implemented BMPs pursuant to its agreement with the DEQ. To the extent plaintiffs allege in their CWA claim that the Forest Service has not adequately implemented BMPs, the court finds that defendants have not violated the CWA. As to plaintiffs' fifth claim for violation of the CWA and the APA, the issuance of AOIs and the 2006 Permit in this respect was not arbitrary and capricious under the APA. Plaintiffs' motion for summary judgment on this ground should be denied.

## ORDER

Intervenors' motion to strike (#82) the Second Declaration of Johnston is denied.

## RECOMMENDATION

Based on the foregoing, it is recommended that plaintiffs' motion for summary judgment (#68) be denied; defendants' motion for summary judgment (#98) be granted; and intervenors' motion for summary judgment (#81) be granted, and that this action be dismissed, and judgment entered accordingly.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals*. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

*Objections to this Report and Recommendation, if any, are due by July 17, 2009. If objections are filed, any responses to the objections are due 14 days after the objections are filed.* Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this 29 day of June, 2009.

UNITED STATES MAGISTRATE JUDGE